FILED

2015 JUN 11  PM 3: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

#### October 2014 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>        v.<br><br>JOSEPH R. ALTAMIRANO,<br><br>      Defendant. | No. CR 1**CR15 - 0321**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to<br>Commit Health Care Fraud;<br>18 U.S.C. § 1347: Health Care<br>Fraud; 18 U.S.C. § 2(b): Causing<br>an Act to be Done] |

The Grand Jury charges:

### COUNT ONE

#### [18 U.S.C. § 1349]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.    Defendant JOSEPH R. ALTAMIRANO, M.D. ("ALTAMIRANO") was a physician who owned, operated, and oversaw a medical clinic located at 5300 Santa Monica Blvd., Suite 202, Los Angeles, California, within the Central District of California (the "Altamirano Clinic").

2.   Co-conspirator "CC-1" was the office manager and biller for the Altamirano Clinic.

3.   Co-conspirator "CC-2" was a "marketer" who recruited Medicare beneficiaries for the Altamirano Clinic.

The Medicare Program

4.   Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

5.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each beneficiary was given a unique health insurance claim number ("HICN").  Home health agencies ("HHAs"), hospices, durable medical equipment ("DME") supply companies, physicians, and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

6.   To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations.  If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

7.   A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

8.    Most providers submitted their claims electronically
pursuant to an agreement they executed with Medicare in which
the providers agreed that: (a) they were responsible for all
claims submitted to Medicare by themselves, their employees, and
their agents; (b) they would submit claims only on behalf of
those Medicare beneficiaries who had given their written
authorization to do so; and (c) they would submit claims that
were accurate, complete, and truthful.

9.    Medicare generally reimbursed a provider for physician
services that were medically necessary to the health of the
beneficiary and were personally furnished by the physician or
the physician's employee under the physician's direction.

10.    Medicare generally reimbursed a provider for DME only
if the DME was prescribed by the beneficiary's physician, the
DME was medically necessary to the treatment of the
beneficiary's illness or injury, and the DME supply company
provided the DME in accordance with Medicare regulations and
guidelines, which governed whether Medicare would reimburse a
particular item or service.   For power wheelchairs ("PWCs"),
Medicare required the DME supply company to have and maintain
documentation showing that the physician ordering the PWC
performed a face-to-face evaluation of the patient.

11.    Medicare generally reimbursed a provider for home
health services only if, among other requirements, the Medicare
beneficiary was homebound and did not have a willing caregiver
to assist him or her; the beneficiary needed skilled nursing
services or physical or occupational therapy services; the
beneficiary was under the care of a qualified physician who

1   established a Plan of Care (CMS Form 485) for the beneficiary,
2   signed by the physician and also signed by a registered nurse
3   ("RN") from the HHA; and the skilled nursing services or
4   physical or occupational therapy were medically necessary.

5        12.   CMS contracted with regional contractors to process
6   and pay Medicare claims.  Noridian Administrative Services
7   ("Noridian") was the contractor that processed and paid Medicare
8   DME claims in Southern California during the relevant time
9   period.  Noridian was the contractor that processed claims
10  involving Medicare Part B physician services in Southern
11  California from approximately September 2013 to the present.
12  Prior to Noridian, the contractor for Part B physician services
13  was Palmetto GBA from 2009 to 2013.  Prior to Palmetto GBA, the
14  contractor for Part B physician services was National Health
15  Insurance Company from 2005 to 2009.  National Government
16  Services ("NGS") was the contractor that processed and paid
17  Medicare claims for home health services in Southern California
18  during the relevant time period.

19       13.   To bill Medicare for physician services or DME
20  provided to a beneficiary, a provider was required to submit a
21  claim form (Form 1500) to the Medicare contractor processing
22  claims at that time.  To bill Medicare for home health services,
23  a provider was required to submit a claim form (Form UB-04) to
24  NGS.  When a Form 1500 or Form UB-04 was submitted, usually in
25  electronic form, the provider was required to certify:

26            a.   that the contents of the form were true, correct,
27  and complete;

28

4

1        b.    that the form was prepared in compliance with the

2  laws and regulations governing Medicare; and

3        c.    that the services being billed were medically

4  necessary.

5    14.  A Medicare claim for payment was required to set

6  forth, among other things, the following: the beneficiary's name

7  and unique Medicare identification number; the type of services

8  provided to the beneficiary; the date that the services were

9  provided; and the name and Unique Physician Identification

10  Number ("UPIN") or National Provider Identifier ("NPI") of the

11  physician who prescribed or ordered the services.

12  B.   THE OBJECT OF THE CONSPIRACY

13    15.  Beginning in or around January 2005, and continuing

14  through in or around May 2015, in Los Angeles County, within the

15  Central District of California, and elsewhere, defendant

16  ALTAMIRANO, together with CC-1, CC-2, and others known and

17  unknown to the Grand Jury, knowingly combined, conspired, and

18  agreed to commit health care fraud, in violation of Title 18,

19  United States Code, Section 1347.

20  C.   THE MANNER AND MEANS OF THE CONSPIRACY

21    16.  The object of the conspiracy was carried out, and to

22  be carried out, in substance, as follows:

23        a.    In or around January 2005, defendant ALTAMIRANO

24  opened a bank account at Washington Mutual Bank, account number

25  **** 5319 (the "WaMu Account").  Defendant ALTAMIRANO was the

26  sole signatory on this account.

27

28

b.   In or around February 2005, defendant ALTAMIRANO began submitting claims to Medicare and depositing checks from Medicare into the WaMu Account.

c.   In or around May 2011, defendant ALTAMIRANO added co-conspirator CC-1 as a signatory on the WaMu Account.

d.   In or around August 2011, defendant ALTAMIRANO opened a bank account at Wells Fargo Bank, account number ****4663 (the "Wells Fargo Account"). Defendant ALTAMIRANO and co-conspirator CC-1 were signatories on this account. Medicare payments for the Altamirano Clinic were subsequently deposited into this account.

e.   In or around August 2013, defendant ALTAMIRANO submitted to Medicare a revalidation application for the Altamirano Clinic. In this application, defendant ALTAMIRANO listed himself as an individual practitioner and sole contact for the Altamirano Clinic.

f.   Individuals known as "marketers," including CC-2, traveled throughout Southern California to recruit Medicare beneficiaries and take them to the Altamirano Clinic. To induce the beneficiaries, the marketers told the beneficiaries, among other things, that Medicare had a limited-time offer for free PWCs and that the beneficiaries could receive free vitamins.

g.   The marketers, including CC-2, brought Medicare beneficiaries to the Altamirano Clinic so that defendant ALTAMIRANO could write medically unnecessary prescriptions for DME and medically unnecessary certifications for home health services.

6

1    h.   At times, while the beneficiaries were at the
2  Altamirano Clinic, conspirators provided them with certain
3  medically unnecessary services, including blood draws and
4  ultrasounds.  At other times, conspirators gave the
5  beneficiaries toenail trimmings and foot massages.  At still
6  other times, the beneficiaries received few or no services.

7    i.   At times, while the beneficiaries were at the
8  Altamirano Clinic, defendant ALTAMIRANO met with them briefly,
9  but often did not physically examine them.  At other times, the
10  beneficiaries did not meet defendant ALTAMIRANO at all.

11    j.   Subsequently, defendant ALTAMIRANO and his co-
12  conspirators, including co-conspirator CC-1 and others known and
13  unknown to the Grand Jury, submitted and caused the submission
14  of false and fraudulent claims to Medicare for services that, as
15  defendant ALTAMIRANO then well knew, were not provided to the
16  beneficiaries, including, depending on the beneficiary, nerve
17  conduction velocity studies ("NCVs"), removal of finger and toe
18  tissue, office visits, physical therapy, and some ultrasounds.
19  These beneficiaries included D.B., G.R., and L.H.

20    k.   Defendant ALTAMIRANO signed prescriptions for DME
21  items, including PWCs and related accessories, that defendant
22  ALTAMIRANO then well knew were not medically necessary.
23  Defendant ALTAMIRANO provided these prescriptions to CC-2 and
24  other co-conspirators known and unknown to the Grand Jury.
25  Defendant ALTAMIRANO also knew that these prescriptions would be
26  used to submit fraudulent claims to Medicare for DME, including
27  PWCs and related accessories.  The beneficiaries in whose names
28  these claims were submitted include B.A., C.A., G.R., G.S., and

1  M.H.

2          l.    In addition, defendant ALTAMIRANO signed home

3  health certifications that defendant ALTAMIRANO then well knew

4  were not medically necessary.  Defendant ALTAMIRANO provided

5  these certifications to other co-conspirators, so that they

6  could be used by HHAs to submit false and fraudulent claims to

7  Medicare for home health services.

8          m.    As a result of the submission of the false and

9  fraudulent claims described above, Medicare made payments by

10  check to Altamirano, as well as payments to numerous bank

11  accounts, including the Wells Fargo Account, on which defendant

12  ALTAMIRANO was a signatory.

13      17.  Between in or around January 2006, and in or around

14  September 2014, defendant ALTAMIRANO and his co-conspirators

15  submitted and caused the submission of approximately $22,788,117

16  in claims to Medicare, resulting in Medicare payments of

17  approximately $12,641,373.

18  ///

19  ///

20  ///

21

22

23

24

25

26

27

28

COUNTS TWO THROUGH THREE

[18 U.S.C. §§ 1347, 2(b)]

A.   INTRODUCTORY ALLEGATIONS

18.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 14 of this Indictment as though set forth in their entirety herein.

B.   THE SCHEME TO DEFRAUD

19.   Beginning in or around January 2005, and continuing through in or around May 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALTAMIRANO, together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

20.   The fraudulent scheme operated, in substance, as described in paragraph 16 of this Indictment, which is hereby incorporated by reference as though set forth in its entirety herein.

9

D.    THE EXECUTION OF THE FRAUDULENT SCHEME

21.    On or about the dates set forth below, within the Central District of California, and elsewhere, defendant ALTAMIRANO, together with CC-1, CC-2, and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted and caused to be submitted to Medicare for payment the following false and fraudulent claims:

///

///

///

| COUNT | BENEFICIARY | CLAIM NUMBER | APPROX. DATE SUBMITTED | APPROX. AMOUNT OF CLAIM |
|-------|-------------|--------------|------------------------|-------------------------|
| TWO | L.H. | 551111116002990 | 4/21/11 | $797.00 |
| THREE | D.B. | 551111283230230 | 4/21/12 | $702.00 |

A TRUE BILL

/s/
Foreperson

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD E. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

GEJAA GOBENA
Deputy Chief, Fraud Section
United States Department of Justice

LAURA CORDOVA
Assistant Chief, Fraud Section
United States Department of Justice

FRED MEDICK
Trial Attorney, Fraud Section
United States Department of Justice