UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2016 Grand Jury

| UNITED STATES OF AMERICA, | No. CR 15-00321(A)-GW |
|---|---|
| Plaintiff, | F I R S T |
| v. | S U P E R S E D I N G |
| | I N D I C T M E N T |
| JOSEPH R. ALTAMIRANO, | [18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; |
| Defendant. | 18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A. INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

1. Defendant JOSEPH R. ALTAMIRANO, M.D. ("ALTAMIRANO") was a physician who owned, operated, and oversaw a medical clinic located at 5300 Santa Monica Blvd., Suite 202, Los

Angeles, California, within the Central District of California (the "Altamirano Clinic").

2. Co-conspirator "CC-1" was the office manager and biller for the Altamirano Clinic.

3. Co-conspirator "CC-2" was a "marketer" who recruited Medicare beneficiaries for the Altamirano Clinic.

The Medicare Program

4. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

5. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number ("HICN"). Home health agencies ("HHAs"), hospices, durable medical equipment ("DME") supply companies, physicians, and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

6. To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

7. A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

8. Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that: (a) they were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) they would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) they would submit claims that were accurate, complete, and truthful.

9. Medicare generally reimbursed a provider for physician services that were medically necessary to the health of the beneficiary and were personally furnished by the physician or the physician's employee under the physician's direction.

10. Medicare generally reimbursed a provider for DME only if the DME was prescribed by the beneficiary's physician, the DME was medically necessary to the treatment of the beneficiary's illness or injury, and the DME supply company provided the DME in accordance with Medicare regulations and guidelines, which governed whether Medicare would reimburse a particular item or service. For power wheelchairs ("PWCs"), Medicare required the DME supply company to have and maintain documentation showing that the physician ordering the PWC performed a face-to-face evaluation of the patient.

11. Medicare generally reimbursed a provider for home health services only if, among other requirements, the Medicare beneficiary was homebound and did not have a willing caregiver

to assist him or her; the beneficiary needed skilled nursing services or physical or occupational therapy services; the beneficiary was under the care of a qualified physician who established a Plan of Care (CMS Form 485) for the beneficiary, signed by the physician and also signed by a registered nurse ("RN") from the HHA; and the skilled nursing services or physical or occupational therapy were medically necessary.

12. CMS contracted with regional contractors to process and pay Medicare claims. Noridian Administrative Services ("Noridian") was the contractor that processed and paid Medicare DME claims in Southern California during the relevant time period. Noridian was the contractor that processed claims involving Medicare Part B physician services in Southern California from approximately September 2013 to the present. Prior to Noridian, the contractor for Part B physician services was Palmetto GBA from 2009 to 2013. Prior to Palmetto GBA, the contractor for Part B physician services was National Health Insurance Company from 2005 to 2009. National Government Services ("NGS") was the contractor that processed and paid Medicare claims for home health services in Southern California during the relevant time period.

13. To bill Medicare for physician services or DME provided to a beneficiary, a provider was required to submit a claim form (Form 1500) to the Medicare contractor processing claims at that time. To bill Medicare for home health services, a provider was required to submit a claim form (Form UB-04) to NGS. When a Form 1500 or Form UB-04 was submitted, usually in electronic form, the provider was required to certify:

4

a. that the contents of the form were true, correct, and complete;

b. that the form was prepared in compliance with the laws and regulations governing Medicare; and

c. that the services being billed were medically necessary.

14. A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI") of the physician who prescribed or ordered the services.

B. THE OBJECT OF THE CONSPIRACY

15. Beginning in or around January 2005, and continuing through in or around May 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALTAMIRANO, together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

C. THE MANNER AND MEANS OF THE CONSPIRACY

16. The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a. In or around January 2005, defendant ALTAMIRANO opened a bank account at Washington Mutual Bank, account number **** 5319 (the "WaMu Account"). Defendant ALTAMIRANO was the sole signatory on this account.

  b. In or around February 2005, defendant ALTAMIRANO began submitting claims to Medicare and depositing checks from Medicare into the WaMu Account.

  c. In or around May 2011, defendant ALTAMIRANO added co-conspirator CC-1 as a signatory on the WaMu Account.

  d. In or around August 2011, defendant ALTAMIRANO opened a bank account at Wells Fargo Bank, account number **** 4663 (the "Wells Fargo Account"). Defendant ALTAMIRANO and co-conspirator CC-1 were signatories on this account. Medicare payments for the Altamirano Clinic were subsequently deposited into this account.

  e. In or around August 2013, defendant ALTAMIRANO submitted to Medicare a revalidation application for the Altamirano Clinic. In this application, defendant ALTAMIRANO listed himself as an individual practitioner and sole contact for the Altamirano Clinic.

  f. Individuals known as "marketers," including CC-2, traveled throughout Southern California to recruit Medicare beneficiaries and take them to the Altamirano Clinic. To induce the beneficiaries, the marketers told the beneficiaries, among other things, that Medicare had a limited-time offer for free PWCs and that the beneficiaries could receive free vitamins.

  g. The marketers, including CC-2, brought Medicare beneficiaries to the Altamirano Clinic so that defendant ALTAMIRANO could write medically unnecessary prescriptions for DME and medically unnecessary certifications for home health services.

  h. At times, while the beneficiaries were at the Altamirano Clinic, conspirators provided them with certain medically unnecessary services, including blood draws and ultrasounds. At other times, conspirators gave the beneficiaries toenail trimmings and foot massages. At still other times, the beneficiaries received few or no services.

  i. At times, while the beneficiaries were at the Altamirano Clinic, defendant ALTAMIRANO met with them briefly, but often did not physically examine them. At other times, the beneficiaries did not meet defendant ALTAMIRANO at all.

  j. Subsequently, defendant ALTAMIRANO and his co-conspirators, including co-conspirator CC-1 and others known and unknown to the Grand Jury, submitted and caused the submission of false and fraudulent claims to Medicare for services that, as defendant ALTAMIRANO then well knew, were not provided to the beneficiaries, including, depending on the beneficiary, nerve conduction velocity studies ("NCVs"), removal of finger and toe tissue, office visits, physical therapy, and some ultrasounds. These beneficiaries included D.B., G.R., L.H., M.A., K.S., V.K., and T.A.

  k. In order to conceal the false and fraudulent claims that defendant ALTAMIRANO and his co-conspirators submitted and caused to be submitted to Medicare for services that were not provided to the beneficiaries, defendant ALTAMIRANO falsified and caused to be falsified patient charts to reflect (1) services that the beneficiaries did not receive from defendant ALTAMIRANO and (2) medical conditions that the beneficiaries were not then experiencing.

l.  Defendant ALTAMIRANO signed prescriptions for DME items, including PWCs and related accessories, that defendant ALTAMIRANO then well knew were not medically necessary. Defendant ALTAMIRANO provided these prescriptions to CC-2 and other co-conspirators known and unknown to the Grand Jury. Defendant ALTAMIRANO also knew that these prescriptions would be used to submit fraudulent claims to Medicare for DME, including PWCs and related accessories. The beneficiaries in whose names these claims were submitted include B.A., C.A., G.R., G.S., and M.H.

m.  In addition, defendant ALTAMIRANO signed home health certifications that defendant ALTAMIRANO then well knew were not medically necessary. Defendant ALTAMIRANO provided these certifications to other co-conspirators, so that they could be used by HHAs to submit false and fraudulent claims to Medicare for home health services. The beneficiaries in whose names these claims were submitted include T.A.

n.  As a result of the submission of the false and fraudulent claims described above, Medicare made payments by check to Altamirano, as well as payments to numerous bank accounts, including the Wells Fargo Account, on which defendant ALTAMIRANO was a signatory.

17.  Between in or around January 2006, and in or around May 2015, defendant ALTAMIRANO and his co-conspirators submitted and caused the submission of approximately $21,812,638 in claims to Medicare, resulting in Medicare payments of approximately $11,143,045.

COUNTS TWO THROUGH SEVEN

[18 U.S.C. §§ 1347, 2(b)]

A. INTRODUCTORY ALLEGATIONS

18. The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 14 and 16 through 17 of this First Superseding Indictment as though set forth in their entirety herein.

B. THE SCHEME TO DEFRAUD

19. Beginning in or around January 2005, and continuing through in or around May 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALTAMIRANO, together with CC-1, CC-2, and others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C. MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

20. The fraudulent scheme operated, in substance, as described in paragraph 16 of this First Superseding Indictment, which is hereby incorporated by reference as though set forth in its entirety herein.

///

///

D. THE EXECUTION OF THE FRAUDULENT SCHEME

21. On or about the dates set forth below, within the Central District of California, and elsewhere, defendant ALTAMIRANO, together with CC-1, CC-2, and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted and caused to be submitted to Medicare for payment the following false and fraudulent claims:

| COUNT | BENEFICIARY | CLAIM NUMBER | APPROX. DATE SUBMITTED | APPROX. AMOUNT OF CLAIM |
|---|---|---|---|---|
| TWO | L.H. | 551111116002990 | 4/26/2011 | $702.00 |
| THREE | D.B. | 551111283230230 | 10/10/2011 | $702.00 |
| FOUR | T.A. | 551113116674600 | 4/26/2013 | $200.00 |
| FIVE | K.S. | 551814156723390 | 6/5/2014 | $400.00 |

///
///
///
///
///
///
///
///
///

10

| COUNT | BENEFICIARY | CLAIM NUMBER | APPROX. DATE SUBMITTED | APPROX. AMOUNT OF CLAIM |
|---|---|---|---|---|
| SIX | V.K. | 551814156722950 | 6/5/2014 | $400.00 |
| SEVEN | K.S. | 551815138491890 | 5/18/2015 | $200.00 |

A TRUE BILL

/s/
Foreperson

EILEEN M. DECKER
United States Attorney

*[signature]*

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

GEORGE CARDONA
Assistant United States Attorney
Chief, Major Frauds Section

RANEE KATZENSTEIN
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JOSEPH BEEMSTERBOER
Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

ALEXANDER F. PORTER
Trial Attorney, Fraud Section
United States Department of Justice